SARAH E. FREDERIC ET AL. v. PIZARIO K. MAYERS.

[43 South. Rep., 677.]

LAND AND CONVEYANCES. *Easement. Right to occupy. Assignment of right. Estoppel. Statute of limitations.* Code 1892, §§ 2730, 2734.

Where a landowner executed a writing, in form of letter, authorizing a newspaper publisher to build a house on a designated lot, with the right of possession so long as he used the same for an office, publishing his newspaper there, and the grant was acted upon:

(a) The publisher acquired the right to the exclusive use of the lot, terminable only by his death or ceasing to publish the newspaper there; and

(b) Such right, with the assent of the landowner, expressed or implied, was assignable; and

(c) If the landowner acquiesced in the improvement of the lot by one claiming it as assignee of the publisher, he is thereby estopped to interfere while the latter publishes the newspaper there, although the name of the paper be changed; and

(d) If such assignee hold the lot for more than ten years, claiming his right of occupancy openly and adversely to, and without question from, the owner, he thereby acquired an easement, protected by the statute of limitations so long as he continued to publish the newspaper there.

FROM the chancery court of Jackson county.

HON. THADDEUS A. WOOD, Chancellor.

Mrs. Frederic and others, the appellants, were complainants in the court below; Mayers, appellee, was defendant there. The bill sought the cancellation of defendant's claim to a lot in the town of Scranton as a cloud upon complainants' title thereto. From a decree wholly in defendant's favor the complainants appealed to the supreme court.

In 1874 one Melancthon Smith established a newspaper in the town of Scranton, Miss., having secured donations from the

citizens of that place, and having obtained the promise of W. E. Frederic, the ancestor of the complainants, of the lot upon which to erect a building. In order to fully understand the conditions of the donation of the lot, he wrote Frederic, who was then a resident of New Orleans, a letter, substantially as follows:

"I now have the lumber on the ground and am ready to commence an office for the *Star.* I propose to build on the lot which you pointed out to me, . . . and will be pleased if you will write and state the agreement, that there may be no mistake."

To which letter Frederic replied in substance as follows:

"I agree to give you the privilege of building an office for the publication of the *Star,* on the lot pointed out by you. . . . You can retain possession of the lot and building as long as you use the same for an office for the *Star.*"

The building was erected, and the publication of the *Star* continued by Smith for about two years, when he sold out to one Richmond, who afterwards consolidated his paper with the *Democrat,* published by Mayers, the appellee, and they jointly published the *Democrat-Star,* occupying and holding the lot on which Smith had begun the publication of the *Star.* In 1884 Richmond sold his interest to Mayers for $1,000, taking from him a conveyance which, after describing the personal property, concludes: "Together with all my rights in the books and business of the aforesaid printing office and the rights to the ground upon which it stands." About the time of the sale to Mayers, Frederic moved to Scranton and lived there until his death in 1904, and knew of the conveyance to Mayers; he acquiesced in the same, and stated to several persons that Mayers had the use of the lot so long as he continued to publish a newspaper, and when he ceased to do so the lot was to revert.

Appellants contended that the instrument under which Smith held the land was not transferable, but was personal, and related alone to Smith's newspaper, the *Star,* and, when Smith ceased

to occupy the lot as an office, his rights to the premises ceased, and Richmond acquired no rights which he could transfer to Mayers; that the license given Smith was revocable at the pleasure of Frederic; that Mayers occupied the land by parol license from Frederic, which was revoked by the death of Frederic; and therefore appellants are entitled to possession; that under any view of the case the decree of the court below should have defined the respective rights of the parties and should be reversed or modified so as to protect the reversionary interest of complainants.

Appellee contended that the agreement between Frederic and Smith vested in Smith not a mere license, revocable at pleasure or by death, but created an easement and interest, not in the fee, but in the occupancy and use of the lot, according to the terms prescribed; that any change in the occupancy and use of the lot, with the consent, expressed or implied, of Frederic, was valid, as was any waiver of his rights by him as to any condition of the contract; that since Frederic had acquiesced and approved of the occupancy by Mayers, and had knowledge of the improvements made upon the lot by him, he was estopped from interfering with Mayers' rights; and, further, that the statute of limitations protected Mayers' claim of an easement, just as it did any other right connected with land, and that he had always claimed his right of occupancy openly and adversely to Frederic, who never questioned the right.

*Ford, White & Ford,* and *McWillie & Thompson,* for appellants.

That the letters between Smith and Frederic, deceased, must be treated as evidencing the rights of the parties seems manifest. The statute of frauds, among the wisest of legislative enactments, is predicated of knowledge that human testimony is uncertain and cannot be depended upon; it is uncertain because of the frailty of human recollection more, perhaps, than because

89 Miss.—9

of the wickedness of mankind. The philosophy of the statute is much broader than its terms. If we must determine between writings made and acted upon at the time of a transaction and the uncertain memories of witnesses about what occurred, was said and done, years before, every teaching of wisdom and of the law urges us to accept the writings.

According to the writings Frederic granted Smith nothing more than a *privilege* of building an office on the lot and (the privilege) of retaining possession of the lot and building as long as he (Smith) used the same for an office for (his newspaper) the *Star*.

What is a privilege? "A privilege is . . . a right peculiar to the person on whom it is conferred, not to be exercised by another or others." 23 Am. & Eng. Ency. Law, 45, and cases cited.

It follows, therefore, that the privilege conferred on Smith by Frederic was not assignable, unless by consent of the owner of the land.

If non-assignable, Richmond and Mayers, who entered under Smith, acquired no rights whatever by their respective entries; they, however, having entered in recognition of Frederic's title, are estopped to set up an adverse claim of ownership by reason of long occupation, they having always recognized the title under which they entered upon the land. All this is true, even though they acted upon the idea that Melancthon Smith acquired an assignable interest in the lot.

If we treat the letter as investing Smith with an assignable interest in the land, it does not help defendant's case or lead to any conclusion more favorable to him, since he must then be treated as standing exactly in the shoes of his original assignor, Smith, whose privilege, or right, if you please to so call it, was certainly revocable. It was a mere license and not a grant. It was a license, too, of a low order, for the word used in the letter is "privilege." Privileges are never assignable, even if

licenses sometime are. A license is a personal privilege terminable at the will of either party and a licensor may revoke it at any time, by the use of express words to that effect, or by doing any act evidencing intention to revoke. No formal notice to the licensee of the revocation is necessary. 18 Am. & Eng. Ency. Law (2d ed.), 1140.

In this case the death of Frederic, complainants' ancestor, was a revocation of the license. 18 Am. & Eng. Ency. Law (2d ed.), 1144. All the authorities on the subject are to the same effect. But certainly the license was revoked by the demand made by complainants before beginning suit, which demand is admitted in the answer. A mere privilege (the word used in the letter is "privilege") is not superior to a license. A privilege to build and occupy a house on land of another may be something less than a "license;" never more than one.

If the license was not assignable, but the parties who went onto the land under Melancthon Smith did so upon the idea that it was assignable, they must yield possession, since they have no title and have occupied the land in recognition of complainants' title.

If the license was assignable, they as assignees must yield possession for the same reason.

An irrevocable license is one which is coupled with an interest or grant; as if Frederic had sold a lot to Smith and by the deed thereto had granted him a right to use an adjoining lot for designated purposes. There is no grant of any kind coupled with the license involved in this case; you can make nothing of the letter save that it evidences a license ("privilege" is the word used) given to Smith, authorizing him to build an office for a designated newspaper on the lot and retain possession of it an·. the building as long as he (Smith) used the same for an office for the *Star*. There was no consideration for the donation. Surely, in the absence of a contract between them, the giving of a dime to a beggar by one man is not a consider-

ation for a like gift by another, and the giving of lumber by mill men to an editor is not a consideration for the giving of the use of the land to him by a landowner. But if a consideration can be found for the privilege given by the letter, the scope of the grant is not thereby enlarged, since such consideration must be referred to the grant and treated as supporting it, and should not be used to enlarge it. There is no assault by complainants on the letter as being a *nudum pactum*, and the grant made by it should not be enlarged because a consideration shall be (if any can be) suggested for its execution.

According to Mayers' answer and testimony, he occupied the premises by and under, not the letter, but a parol license given him by complainants' ancestor. If this be true, the letter is out of the case and the parol license has been revoked by the death of Frederic and the demand, and the decree of the chancellor is erroneous. *Hodgkins* v. *Farrington* (Mass.), 15 Am. St. Rep., 168; *Crosdale* v. *Lanigan* (N. Y.), 26 Am. St. Rep., 551; *Pitzman* v. *Boyce* (Mo.), 33 Am. St. Rep., 536.

The true theory of the case is that Smith entered upon the land under the letter, as a mere licensee; the privilege granted by the letter was personal to Smith; and it related alone to Smith's newspaper, the *Star*. When Smith ceased to occupy the lot as an office for the *Star* the letter became a dead letter and ceased to be operative as a grant of any right.

Richmond and Mayers, however, entered under Smith, and occupied the lot in full recognition of Frederic's title; but they did so presuming and mistakenly believing that the privilege granted Smith by the letter was assignable, was still in force, and that they had acquired that privilege. The complainants are, under this view, entitled to a decree as prayed for in their bill of complaint.

It makes no difference, under this view of the facts, if it shall be determined that Frederic, complainants' ancestor, labored under the same presumption and mistaken belief.

Defendant in his answer avers that complainants' ancestor, shortly after defendant took possession of the property, informed him that he had the right to occupy the lot so long as he published a newspaper thereon. In respect to this, two things are to be said: It is not responsive to anything in the bill of complaint and there is not proof to substantiate it. It is matter in avoidance and is unproved, and we would be justified in dismissing it as untrue. But treating it as true, what is its legal significance? It was not a compliance with the statute of frauds. Surely not. It did not enlarge the scope or legal effect of the letter to Smith under which he entered, and which letter is the only writing ever signed by Frederic. All that the conversation amounted to, or could have amounted to, was this: It shows that Frederic misinterpreted and misunderstood the letter he had written. Mayers did not act upon the supposed statement, for his conversation with complainants' ancestor was after he had acquired the rights of Smith and gone upon the property. Frederic did not intentionally mislead or deceive him, and estoppel cannot be predicated of what Frederic is charged to have said or done.

If it be accepted as true that Mayers had the conversation, as averred in the answer, with Frederic, deceased, the only other view that can be taken of it is to consider it as amounting to an oral license or privilege direct to Mayers, authorizing him to occupy the lot so long as he published his paper thereon. If this be true, it shows conclusively that Mayers occupied the land in recognition of Frederic's title; he cannot, therefore, set up the statute of limitations, and the license was revoked by Frederic's death in 1904. Of course this brings us to the same conclusion—the decree appealed from should be reversed.

The statement in the brief of opposing counsel to the effect that the defendant went into possession of the lot in controversy under a deed from Richmond sufficient to convey the fee simple is besides the mark. Mayers went upon the land as a

partner with Richmond and had been in possession a year or more when the deed was made, and the words of the deed are "the rights to the ground on which the office stands." This gave Mayers nothing more than Richmond had, and counsel cannot make it do greater service.

In law, if not in morals and in fact, the weakest point upon which counsel seeks to base estoppel is Mayers' labor for the common good. There is no proof in this record that Mayers' paper ever accomplished any public good and the court will surely not be justified, however much good it may in fact have done, in taking judicial notice of it. The case of *Breland* v. *O'Neal,* 88 Miss., 449 (s.c., 40 South. Rep., 885), which seems to be so much relied upon by our adversary, is really not in point. That was a case where a grantor, intending to convey a fee simple estate, executed a deed by the terms of which he conveyed only a life estate, and the grantee, with the knowledge and without objection from the grantor, took actual possession of the land believing that he had acquired the fee simple title and occupied it adversely and continuously for more than ten years from his entry. Of course it was held by this court that the grantee's title to the fee was perfected by the statute of limitations, Code 1892, § 2734, and that parol evidence was admissible to show the facts just stated. There is no proof in this record that the deceased, Frederic, was a grantor at all, further than the fact that he wrote the letter in controversy. This letter negatives the idea that he intended to convey the fee simple estate, and there is no proof that Smith or Richmond or Mayers or anybody else went upon the land believing that they had acquired the fee simple estate. On the contrary, they all knew that they had not acquired it, and there is no proof that any of them occupied the land adversely. On the contrary, the defendant shows quite conclusively that they all occupied it in subordination to Frederic's title.

*J. A. P. Campbell,* for appellee.

More than thirty years ago Mr. Frederic, being a large land owner in the village of Scranton, which had twelve houses, and desirous to have a newspaper published there, by writing let to Mr. Smith a lot on which to erect a house in which to publish the *Star,* and to have the lot as long as he continued to publish it. Smith erected a house on the lot, and published the *Star* several years, when, with the consent of Frederic, as shown by witness Dees, he sold to Richmond, who continued the publication of the paper for a time, when he was joined by Mayers, appellee, and they changed the name of the paper. And in June, 1884, Mayers purchased the interest of Richmond for $1,000, taking from him a conveyance of his interest in the plant, including his "right to the ground" on which the building stood, which conveyance was acknowledged and recorded. Frederic had moved to Scranton, lived there, mingled with the people, was often at the lot, doubtless read the newspaper he had promoted, saw what was going on, repeatedly declared that Mayers was entitled to the lot as long as he used it for publishing a paper, and when this ceased the lot was to come back to him or his heirs. Upon the view of Mr. Thompson, for appellants, that the possession of the successive holders was continuous and all referable to the letter of Frederic to Smith and to be determined by that, the law is with the appellee.

The contract between Frederic and Smith, shown by the letters, created a tenancy—an agreement to divest Frederic of the possession of the lot and invest Smith with it for so long a time as he should publish the paper named. This was not a mere license, revocable at pleasure or by death. It was more than that. It created an easement or servitude and substantial right —an interest, not in the fee, but the occupancy and use of the lot for a prescribed term. It was a tenancy created by writing, and good under the statute of frauds. Any change in the occupancy and use of the lot with the consent, express or implied,

of Frederic was valid. Any waiver of his right by him as to any condition of the contract was valid. *Lee* v. *Hawks,* 68 Miss., 669.

The proposition that the agreement between Frederic and Smith was a mere license, revocable by Frederic at pleasure, and that after Smith erected the house on the lot and proceeded with his paper, Frederic could revoke the license, is monstrous and untenable.

Equitable Estoppel.—Another view equally decisive of the case in favor of appellee is the beneficent doctrine of estoppel employed by courts, and by none more freely than by ours, as shown by a long line of decisions, to prevent fraud and injustice. Frederic knew all that occurred in reference to the lot and newspaper, and consented and acquiesced, stood by and approved, as shown by his oft repeated declarations of the right of Mayers to hold, use and enjoy the lot so long as he continued to publish a paper. Mayers made large expenditures on the lot, all known to Frederic, acquiesced in by him and binding him to do nothing inconsistent with the right of Mayers.

Statute of Limitations.—A third view equally decisive in favor of appellee is the statute of limitations of ten years, which protects a claim of a tenancy or easement or servitude; indeed, every right, corporeal and incoporeal, connected with the land. Mayers never claimed the fee, and has ever held and now holds that in subordination to Frederic, but he has always claimed his right of occupancy adversely to Frederic and all the world, under a valid written instrument duly recorded, known to Frederic and acquisced in by him, who never questioned and always admitted the right of Mayers as claimed, and who would not question it now if alive.

There was no necessity for this suit. The claim of Mayers was known to complainants. It did not and does not involve the fee. It is an improper suit, not one contemplated by our statute for removal of clouds. There is no cloud on the title.

Complainants had in their own hands the evidence of the rights of the parties. Complainants are rightfully taxed with the costs of the case.

H. B. Everett, on same side.

Whatever may have been the right, title or license of Smith, whether in writing or in parol, and more especially if he occupied towards Frederic the relation of a tenant at sufferance, it is perfectly apparent that Richmond first and then Mayers entered into possession of the lot in hostility and not in subordination to the title of Frederic—a fact made known to Frederic in advance of the entry, and ever afterwards admitted and recognized by him. And this fact was further emphasized and given notoriety by the recorded deed from Richmond to Mayers. This being true, then the rule of estoppel against a tenant asserting title by adverse possession against a landlord has no application. Unless it is shown that the possession of Mayers was subordinate to the title of Frederic in its inception, the rule can have no application. Mayers went in under a deed from Richmond, sufficient to convey the fee, placed it upon record, and Frederic recognized the claim. Mayers went in under claim of right and purchase induced by the acts and declarations of the owner. Shall Frederic or his heirs now disprove the declaration of Frederic upon which Mayers and Richmond acted? Is a technical blind rule of estoppel to prevail against Mayers because of a condition he knew not of, in the very face of a counter estoppel in the interest of common honesty, that the heirs of Frederic may not prove to have been false representations made by Frederic upon which Richmond and Mayers acted in ignorance of the facts?

This case presents a claim of adverse possession in hostilty to the owner, of more merit than the case of Breeland v. O'Neal, 88 Miss., 449. In fact, Smith could have set up the claim of title had he continued in possession as that of a fee title subject to possible reverter as consistently as James Cooper

in the case of *Breeland* v. *O'Neal,* and Mayers could as consistently claim the same title in this case as M. J. O'Neal in that had he known the contents of the Frederic-Smith correspondence, and Frederic had said nothing in advance of his purchase as to the meaning or intent. This court said in that case that a slip of paper upon which were written a few sentences that might be construed as intending to give a life estate, might be enlarged into a fee simple title by long possession and declarations of the donor that it was intended as a gift. But this is a case in which a donation is actually solicited and expected on the one hand, not refused, but, at most, limited on the part of the other, land upon which a building is to be erected by other donations, in consideration of public and individual benefit, where common honesty required a donation of the fee or nothing. Where the donor has for twenty years avowed such to have been his purpose. And here is a man sought to be ousted who, in good faith, took over the entire donation, understanding it to have been such in good faith from the declaration of the donor himself. Pays his money, puts his deed upon the public records, has had possession under that deed for twenty years and more, during all of which time he has rendered the public service sought to be secured by the donation. For a quarter of a century this claimant of a little strip of ground for his press has labored for the common good, for progress and growth and advancement till the donor of the little lot has grown rich and died, turning this strip of ground over to his heirs, increased in value from five hundred dollars to one hundred thousand and more.

Referring to the correspondence and construing what was said as shedding light on the meaning and intention of the parties, in the light of events present and subsequent, the meaning is more readily grasped by leaving out the discussion of the location of the lot, and we have about this: "I now have the lumber on the ground and am ready to begin building an office for the *Star.* The citizens about here have subscribed for the building of the

office; some of the mill men gave me the lumber which, together'
with the fact that you kindly furnished the lot, shall be the sub-
ject of editorial notice." Reply: "I agree to give you the privi-
lege of building an office for the publication of the *Star* on the lot
pointed out by you (omitting description), as you ask in your
letter. You will retain possession of the lot and building as long
as you use the same for an office for the *Star."*

According to the theory of complainants this is to be construed
as saying that, "for my part in aid of this public enterprise, the
building donated by other enterprising citizens may be placed on
my lot and will be my property, but you, Smith, have my per-
mission to use the building as long as you use it for publishing
the *Star,* and no longer, and you can proceed to announce edito-
rially that for my donation I have furnished the lot." Imagine
such a donation for a church, a school, or a hospital or other
public building erected by public subscription, dependent upon
the occupancy of a single individual, and upon a change of
administration the donor pouncing upon the prize by right of
such correspondence as fixing his right of property in the struct-
ure. And the court will take notice of the fact that a quarter of
a century ago the country press was almost as much an institution
of public utility, public necessity, and an object of public aid
and donation to secure and maintain in the country towns of this
state, as churches and schools. And the courts will also recog-
nize the fact that such was a wise and correct view, the country
press being at that time of far more importance than in this age
of cheap literature and vast publishing enterprise. The country
press was not only a potent factor in the matter of general edu-
cation, information, and public intelligence, but was indispen-
sable to the public life and growth and advancement of little
towns along the lines of the few railroads of the state. And no
man reaped more abundantly of the golden fruits than the fortu-
nate owner of town lots.

If the bill seeks to terminate a tenancy and recover possession the statutory remedy is complete and the bill is without equity.

If the contract of Frederic and Smith was a donation and grant, with a condition subsequent, and it is sought to have this court to declare a forfeiture for a breach, a court of equity will not lend its aid on general principles, and the right of action is barred by limitation. *Memphis, etc., R. R. Co.* v. *Neighbors,* 51 Miss., 412; *Vicksburg, etc., R. R. Co.* v. *Ragsdale,* 54 Miss., 209.

The representation by Frederic to Dees, and by him repeated to Mayers, that the right of Smith was transferrable upon which they acted and purchased the lot should forever estop Frederic and his heirs from setting up a claim to the property on the theory that such was not the truth. *Money* v. *Ricketts,* 62 Miss., 209; *Lee* v. *Gardiner,* 26 Miss., 521; *Kimp* v. *Pintard,* 32 Miss., 324; *Wilie* v. *Brooks,* 45 Miss., 542; *Cowan* v. *Alsop,* 51 Miss., 158; *Dickson* v. *Green,* 24 Miss., 612; *Nixon* v. *Carco,* 28 Miss., 414.

Argued orally by *R. H. Thompson,* for appellant, and by *H. B. Everett,* and *J. A. P. Campbell,* for appellee.

CALHOON, J., delivered the opinion of the court.

By the correspondence in 1874, exhibits "A" and "B" to the bill, Smith got more than a mere license, revocable by Frederic. He got the right to exclusive use of the property, terminable only by his death or ceasing to publish the *Star.* The successive holders claimed under him. So does Mayers, and he held for twenty years under that right, as was well known to, fully recognized by, and acquiesced in by, Frederic, who, besides, saw Mayers, under that claim, spend a large sum in enlarging the building. Frederic, while alive, fully and accurately defined Mayers' legal rights, when he repeatdly said he had the property as long as he published a newspaper thereon, when it would revert to his estate. When Mayers ceases to publish this paper

there, or dies, Frederic's heirs are entitled to possession of the fee, but not until then.   Mayers has the easement by the statute of limitations and by estoppel.

*Affirmed.*